IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* DAVID W. STEBBINS, | ) ) ) |
| Plaintiff, | ) )  2:21-cv-01803 |
| v. | ) ) ) |
| JEFFERSON CARDIOLOGY ASSOCIATION, P.C., et al., | ) ) ) |
| Defendants. | |

## OPINION

**Mark R. Hornak, Chief United States District Judge**

Plaintiff-Relator David Stebbins ("Stebbins") filed this suit pursuant to the False Claims Act ("FCA"). Stebbins was briefly employed by Defendant Jefferson Cardiology Association ("Jefferson") and alleges that Jefferson and the other named Defendants violated the FCA by being out of compliance with Pennsylvania state medical certification laws. The crux of Stebbins's claims is that by failing to adhere to Pennsylvania state licensure and compliance laws regarding the use of anesthesia in select, specially licensed facilities in connection with ambulatory surgery, Jefferson and the other named Defendants[1] violated the FCA when they sought and received reimbursement from Medicaid and Medicare for arteriogram services—that incorporated the use of anesthesia—performed in those unlicensed facilities.

After the First Amended Complaint was dismissed without prejudice, Stebbins filed a Second Amended Complaint. (ECF No. 57). Defendants moved to dismiss. (ECF No. 63). For the

---

[1] Greater Pittsburgh Surgery LLC, Dr. Gennady Geskin, Dr. Michael Mulock, and Dr. Charles Brown.

1

reasons set forth below, the Motion to Dismiss is granted and this action is dismissed with prejudice.

### I.  BACKGROUND

#### a.  Factual History and Statutory Framework

David Stebbins worked for Defendant Jefferson from October 2020 to September 2021. (ECF No. 57 ¶ 12). Stebbins says that he was "involuntarily terminated . . . as a result of his refusal to participate in unethical conduct." (*Id.*).

Pennsylvania law provides that "[s]urgery shall be performed only in an acute care hospital or in a Class A, Class B or Class C ambulatory surgical facility." 28 Pa. Code § 51.21. Surgery is defined as "[t]he branch of medicine that diagnoses and treats diseases, disorders, malformations and injuries wholly or partially by operative procedures." *Id.* § 551.3. Pennsylvania law sets forth different classifications for facilities licensed as ambulatory surgical facilities:

- **Class A** ASFs are defined as private or group practice offices of practitioners where the procedures performed are limited to those requiring administration of either local or topical anesthesia, or no anesthesia at all and during which reflexes are not obtunded;
- **Class B** ASFs are defined as single-specialty or multi-specialty facilities having a distinct part used for ambulatory surgical treatments involving administration of sedation analgesia or dissociative drugs where reflexes may be obtunded (subject to restrictions concerning patients' "physical status"); and
- **Class C** ASFs are defined as single-specialty or multi-specialty facilities used exclusively for providing ambulatory surgical treatments involving the use of a spectrum of anesthetic agents, up to and including general anesthesia (subject to restrictions concerning patients' "physical status").

*Id.* Only class B and Class C ambulatory surgical facilities are permitted to use monitored anesthesia care in conjunction with ambulatory surgery; the use of monitored anesthesia care at a Class A ambulatory surgical facility is not permitted under Pennsylvania law because such anesthesia "obtunds the reflexes of patients." (ECF No. 57 ¶ 48).

2

Stebbins alleges that, until at least January 1, 2021, Defendants were performing arteriograms and related procedures at what he says were Class A ambulatory surgical facilities. (*Id.*). Arteriograms, angioplasty, and related procedures "involve[] the administration of anesthesia that obtunded the reflexes of patients." (*Id.* ¶ 49). Stebbins says that because Defendants allegedly administered such anesthesia at facilities that were not licensed for the use of that anesthesia, Defendants performed arteriograms and related procedures in violation of Pennsylvania state law.

Pivoting from state law to federal law, the FCA imposes liability for any person or entity who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," 31 U.S.C. § 3729(a)(1)(A); and "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim," 31 U.S.C. § 3729(a)(1)(B). The term "claim" is defined as "any request or demand, whether under a contract or otherwise, for money … that … is presented to an … agent of the United States." 31 U.S.C. § 3729(b)(2)(A)(i).

Medicare part B "provides insurance for physicians' services, outpatient care, medical supplies and laboratory services. Reimbursement for Medicare Part B claims is made by the United States through CMS, which contracts with fiscal intermediaries acting on its behalf to administer and pay Medicare Part B claims from the Medicare Trust Fund." (ECF No. 57 ¶ 27). To be reimbursed for medical services, providers are required to submit a form for each claim submitted to the government. That form states, in relevant parts: "[T]he information on this form is true, accurate and complete"; "I have familiarized myself with all applicable laws, regulations and program instructions, which are available from the Medicare contractor"; "I have provided or will provide sufficient information required to allow the government to make an informed eligibility and payment decision"; and "[T]his claim . . . complies with all applicable Medicare and/or Medicaid laws, regulations and program instructions for payment."

3

Medicaid is administered jointly by the states and the federal government. Medicaid pays for items and services pursuant to plans developed by the states. States then pay health care providers according to established rates, and the federal government reimburses the states a share of "the total amount expended … as medical assistance under the State plan." 42 U.S.C. §§ 1396b(a)(1). To be reimbursed by Pennsylvania's Medicaid program, a provider must adhere to the relevant standards of medical practice:

> In addition to licensing standards, every practitioner providing medical care to MA [Medical Assistance] recipients is required to adhere to the basic standards of practice listed in this subsection. Payment will not be made when the Department's review of a practitioner's medical records reveals instances where these standards have not been met.

55 Pa. Code § 1101.51(d). One such standard of practice is "the principles of medical ethics shall be adhered to." *Id.* § 1101.51(d)(6).

In sum and substance, Stebbins alleges that from 2013 through at least January 1, 2021, Defendants knowingly performed arteriograms and related procedures that, under Pennsylvania law, could only be performed at Class B or Class C facilities (despite not being licensed as such), and then submitted claims to Medicare and Medicaid for reimbursement of those procedures while certifying that they were in compliance with all applicable laws. He alleges that, during this time, Defendants submitted at least 878 such fraudulent claims amounting to at least $2,975,732. (ECF No. 57 ¶ 57). It is from these allegedly fraudulent claims for payment that Stebbins advances his claims in this action, one count for Knowingly Presenting False or Fraudulent Claims, 31 U.S.C. § 3729(a)(1)(A), and one count for Using a False Record or Statement Material to a False Claim, *id.* § 3729(a)(1)(B).

b. **Procedural History and Judicially Noticed Information**

After submission of the Amended Complaint (ECF No. 20), Defendants both moved to dismiss that Complaint and moved for judicial notice of certain information. (ECF No. 28). The judicially noticed information (ECF No. 35) contains public information demonstrating that Medicare has paid out over $60 million to 49 unique health care providers for the at-issue procedure codes when those procedures were performed in a physician's office or another non-ambulatory surgical facility. (ECF No. 55 at 3). Put more simply, Medicare paid out money to providers who were performing arteriograms and similar procedures in doctor's offices.

This Court, after oral argument, granted Defendants' Motion to Dismiss the Amended Complaint without prejudice. (ECF No. 55). Stebbins submitted a Second Amended Complaint ("SAC")(ECF No. 57), and Defendants moved to dismiss the SAC (ECF No. 63), arguing that (1) the public disclosure bar requires dismissal, (2) the SAC does not satisfy the stricter pleading rules of FRCP 9(b), and (3) the SAC fails to sufficiently plead falsity, materiality, and knowledge to make out the federal law claims sought to be advanced.

II. **LEGAL STANDARD**

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter to state a claim to relief that is plausible on its face"—but well-pleaded "factual content" requires more than "labels and conclusions," "a formulaic recitation of [the] cause of action," and "naked assertions devoid of further factual enhancement." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal marks omitted).

FRCP 9(b)'s heightened pleading standard additionally requires a complaint to "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). Courts may consider well-

pleaded allegations as well as "any matters incorporated by reference or integral to the claim, items subject to judicial notice, [and] matters of public record." *Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006) (citation and internal marks omitted). Courts may also "disregard any legal conclusions," *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210–11 (3d Cir. 2009), and reject factual assertions that contradict facts of which the court may take judicial notice. *Anderson v. Macy's, Inc.*, 943 F. Supp. 2d 531, 537 (W.D. Pa. 2013) (citation omitted) (Hornak, J.).

### III. DISCUSSION

A failure to satisfy the public disclosure bar, FRCP 9(b)'s heightened pleading standard, or any of the elements of an FCA claim results in dismissal. *See United States ex rel. Stebbins v. Maraposa Surgical, Inc.*, No. 22-cv-10, 2024 WL 1299705 (W.D. Pa. Mar. 27, 2024) (distinguishing the public disclosure bar, FRCP 9(b), and a FCA claim's elements as different bases for dismissal); *see id.* at *3 ("An [FCA] violation includes four elements: falsity, causation, knowledge, and materiality. . . . A failure to establish any of these elements is fatal to Relator's claims.") (citation and internal marks omitted). Here, Stebbins has not sufficiently pled materiality and falsity, and that is fatal to his claims.

#### a. Materiality

The term "material," as defined under the FCA, "means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(2)(4). "Under any understanding of the concept, materiality 'look[s] to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation.'" *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 193 (2016) (quoting 26 Richard A. Lord, *Williston on Contracts* § 69:12 (4th ed. 2003)). This standard is "demanding" and "rigorous," as the FCA is not "an all-purpose antifraud statute or a vehicle for punishing garden-variety

6

breaches of contract or regulatory violations." *Id.* at 194 (citing *Allison Engine Co. v. United States ex rel. Sanders*, 553 U.S. 662, 672 (2008)). To determine whether an alleged FCA violation is "material," the *Escobar* Court set forth three nonexclusive factors for courts to consider: (1) whether the legal requirement is a "condition of payment"; (2) whether the alleged violation goes to the essence of the bargain or is insubstantial; and (3) the government's (in)action in the wake of the Defendants' alleged fraud. *United States ex rel. Druding v. Care Alternatives*, 81 F.4th 361, 369 (3d Cir. 2023) (*Druding II*); *United States ex rel. Petratos v. Genentech Inc.*, 855 F.3d 481, 489 (3d Cir. 2017).

Stebbins's argument as to the first factor, the "condition of payment" factor, is twofold: as to Medicare, the applicable reimbursement submission form contains language stating that "[t]his claim . . . complies with all applicable Medicare and/or Medicaid laws, regulations, and program instructions for payment." (ECF No. 57 ¶ 32). Stebbins says that by allegedly violating Pennsylvania law in administering anesthesia that can obtund a patient's nerves and movement in a Class A facility and then having those services reimbursed via Medicare without disclosing this alleged noncompliance, Defendants violated an express condition for payment. As to Medicaid, Plaintiff-Relator says that Defendants failed to obtain informed consent by not telling patients that they (Defendants) were not licensed under Pennsylvania state law to provide anesthesia in the locations at issue.

"[B]oilerplate language conditioning payment under Medicare and Medicaid on compliance with all laws and regulations" is not sufficient to meet *Escobar's* high bar for materiality. *Maraposa Surgical*, 2024 WL 1299705, at *3 (quoting *United States v. Kindred Healthcare, Inc.*, 469 F. Supp. 3d 431, 450 (E.D. Pa. 2020)). The Medicare submission forms' references to compliance with all state and local licensing laws are exactly the kind of "boilerplate"

7

allusions that do not cut it under the FCA. This conclusion is also apt as to Stebbins's informed consent arguments given the hoops he jumps through in an effort to establish that informed consent *is* a requirement under Medicaid despite its express absence from the Commonwealth's provisions implementing the same and its narrower definition in the Code of Federal Regulations. *See* 42 C.F.R. § 482.13(b) ("The patient or his or her representative (as allowed under State law) has the right to make informed decisions regarding his or her care. The patient's rights include being informed of his or her health status, being involved in care planning and treatment, and being able to request or refuse treatment."). Thus, it is tenuous to claim that informed consent as to compliance with state facility licensing requirements is a condition of payment under Medicaid. *See United States ex rel. Zaldonis v. Univ. of Pittsburgh Med. Ctr.*, No. 19-cv-01220, 2021 WL 1946661, at *6 (W.D. Pa. May 14, 2021) (holding that the plaintiff-relator's informed consent-based theory failed to establish materiality).

Irrespective of whether assuming the examples listed in the preceding paragraphs qualify as a condition for payment—which is unavailing given that (1) allusions to compliance with state licensing law under Medicare are "boilerplate"; and (2) references to informed consent in federal regulations touch on "participation, not payment," *id.* at *5—a condition for payment is "relevant, but not automatically dispositive" of the materiality inquiry. *Escobar*, 579 U.S. at 194. Defendants' alleged noncompliance with state facility licensing laws pertaining to the use of anesthesia in select venues only is exactly the type of "garden-variety . . . regulatory violation" that *Escobar* decried as immaterial. *Id.*

Here, neither requirement qualifies as an "condition for payment" as set forth in *Escobar*, and even if one or both requirements did qualify as such, that these requirements allegedly went unmet is subject to little weight under *Escobar*. Therefore, this factor weighs in Defendants' favor.

8

The second *Escobar* factor concerns whether the alleged noncompliance is substantial or minor. This factor also weighs in Defendants' favor. Stebbins argues that Defendants' alleged violations of state facility licensing law are material because those violations implicate patient safety, but such an argument is the type of legal conclusion said to be inferred from the pleaded facts that courts are not required to accept. *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993). That is, Stebbins does not explain how the alleged noncompliance at issue is central to the federal government's claims, payment decisions, and processes. On the contrary, the alleged violations here are not "as central to the bargain as the United States ordering and paying for a shipment of guns, only to later discover that the guns were incapable of firing," *United States ex rel. Escobar v. Universal Health Servs., Inc.*, 842 F.3d 103, 111 (1st Cir. 2016), because the government expressly provides for reimbursement for arteriograms and related procedures where those services were performed in a physician's office. (ECF No. 28-22 at 7). At most, Stebbins's claims demonstrate a clash between federal and state law, but given that the payor under Medicare is the federal government, the nature of the alleged violations here is perhaps best described as tangential for these purposes, and violations of that sort do not satisfy the FCA's materiality element.

The third *Escobar* factor asks whether the government continued to pay out Defendants' claims (or claims by other providers engaged in similar services) despite actual knowledge that certain requirements were violated. *Escobar*, 579 U.S. at 195. Here, while the government's actual knowledge of these alleged violations is not evident from the record before the Court, like in the sister *Stebbins* FCA case before Judge Bissoon, the record does demonstrate that the government reimbursed Defendants under Medicare despite the public availability of information that would have put the government on notice of Defendants' alleged violations of Pennsylvania facility licensing law.

More precisely, the governing Medicare CPT payment codes all provide for reimbursement where a given service was performed in a physician's office. (ECF No. 28-7; ECF No. 28-22 (Novitas LCD L35092 stating that lower leg angiogram services are reasonable and necessary and therefore eligible for coverage regardless of whether they are performed in an office, ambulatory surgical facility, or other medical facility)).[2] And Stebbins says that the procedures at issue here were indeed performed at physicians' offices. (ECF No. 57 ¶ 81) ("During the period of time that Relator worked for JCA, he was involved in various conversations and emails that reflected Defendants' knowledge that they were not properly licensed to perform arteriograms in a physicians' office."); (ECF No. 54 at 12)).

The judicially noticed exhibits now in the record show that Doctors Geskin and Mulock[3] were reimbursed from Medicare at rates comparable to the repayment rate for office-based services, not the repayment rate for facility-based services. (*E.g.*, 28-34 at 4 (showing that Dr. Geskin's NPI's average Medicare payment amount in 2016 for services billed under one of the disputed CPT codes was $970.06)); *cf.* (ECF No. 28-10 at 2 (providing that the maximum charges and reimbursement amounts for facility-based services under this CPT code were roughly $323 and $353, respectively)). In plain English, this means that Medicare reimbursed Doctors Geskin and Mulock at the office-based services rate, not the facility-based services rate. Because Medicare reimbursed those Defendants at the higher rate, those Defendants had to have indicated that the places of service of the arteriograms and related procedures rendered during this period were physicians' offices.

---

[2] The Medicare Place of Service Code for office-based services is 11, and the code for an ambulatory surgical center is 24. (ECF No. 28-4).

[3] Dr. Geskin's Medicare NPI (identification number) is 1053319434; Dr. Mulcok's is 1285951228. (ECF Nos. 28-41; 28-42).

10

The combination of (1) submitting (and obtaining reimbursement for) Medicare payment forms with the place of service marked as a physician's office for arteriograms, angioplasty, and related procedures and (2) the accessibility of Pennsylvania state law allegedly prohibiting such conduct means that the government could have readily deduced that Defendants were violating state law, Medicare reimbursement conditions, and the FCA. Yet the government still chose to reimburse Defendants for the procedures described above notwithstanding that Defendants billed Medicare under a "physician's office" place of service code.

Stebbins cannot overcome the open and notorious nature of Defendants' alleged misconduct; the SAC "fails to allege any facts indicating that the government consistently refuses to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual requirement." *Maraposa Surgical*, 2024 WL 1299705, at *3 (citation and internal marks omitted). On the contrary, the CMS payment information demonstrates that the government regularly reimburses Defendants and other similarly situated providers for arteriograms and related procedures where those procedures were performed in a physicians' office. As a result, the government's decision to reimburse Defendants and other similarly situated providers is telling; this factor weighs in favor of Defendants.

Stebbins argues that (1) *Escobar* requires that the government have *actual* knowledge of the alleged violations before its payment decisions can be used to determine materiality; and (2) Defendants' pattern of conduct was longstanding and the Court in *Druding II* relied on the pervasive nature of the alleged misconduct to conclude that there was an issue of fact as to whether the same was material. (ECF No. 65 at 34–36). Neither counterargument is persuasive.

While it is true that *Escobar* references actual knowledge when discussing the government inaction factor, *Escobar*, 579 U.S. at 195, the paragraph from which that proposition stems also

11

says that "proof of materiality can include but is not necessarily limited to" the government's payment decision where it has actual knowledge of alleged noncompliance. *Id.* at 194–95. The *Escobar* factors are nonexclusive, and where, as here, publicly available information readily demonstrates an alleged noncompliance and the government still reimburses Defendants (and others) despite such noncompliance, that is highly probative of materiality. The government's alleged lack of actual knowledge of a defendant's alleged violations prior to the issuance of a payment decision is not a *per se* bar to concluding that a plaintiff-relator has not pled materiality.

As for the longstanding pattern argument sourced from *Druding II*, the alleged misconduct at issue in that case was of a different sort from the alleged regulatory noncompliance here. In *Druding II*, the "longstanding problem" was that the providers' repeatedly certified that certain patients had a terminal illness despite inadequate clinical documentation to sustain those diagnoses and submitted those certifications to Medicare for reimbursement for procedures related to the hospice care of those individuals. *Druding II*, 81 F.4th at 367, 372. Crucially, the *Druding II* court was focused on both the longstanding nature of the violations *and* the significance of the violations. *Id.* at 372 ("This is also not a case where it is beyond dispute that the patients were, in fact, terminally ill."). Given the court's reference to its skepticism of the legitimacy of the services that the *Druding II* defendants provided and then sought reimbursement for, the confirmation (or lack thereof) of the *Druding II* patients' diagnoses was paramount to the Court's conclusion on materiality. *See id.* at 373 (referencing reports that discussed inconsistencies in hospice diagnoses with clinical evidence).

In short, in *Druding II*, patients' medical need for hospice care at all, which went to the essence of the bargain, was in serious doubt. *Id.* In contrast, here there is no contention that the procedures performed were medically unnecessary or should not have occurred. (*See* ECF No. 54).

12

Instead, Stebbins is arguing that those procedures were performed in the wrong place. While that argument might in theory carry some weight if the procedures were not performed in a medical setting whatsoever, the procedures here were still performed in medical facilities, ones that Medicare expressly permits reimbursement for. This is not the mine-run FCA case that claims that the Defendants performed surgeries that were not necessary and then billed Medicare for them. This case concerns only a question of venue.

In summary, *Escobar's* high bar and enumerated factors weigh only in Defendants' favor, and Stebbins's counterarguments fall short. Stebbins has not plausibly pled materiality, and his claims are dismissed.

### b. Falsity

FCA falsity "simply asks whether the claim submitted to the government as reimbursable was in fact reimbursable, based on the conditions for payment set by the government." *United States ex rel. Druding v. Care Alternatives, Inc.*, 952 F.3d 89, 100 (3d Cir. 2020) (*Druding I*). Allegedly false claims for payment can be either factually false or legally false. *United States ex rel. Greenfield v. Medco Health Sols., Inc.*, 880 F.3d 89, 94 (3d Cir. 2018). A claim is factually false where the defendant misrepresented what goods or services it provided. *Id.* A claim is legally false where the "claimant lies about its compliance with a statutory, regulatory, or contractual requirement." *Id.* Defendants' alleged violations here are therefore legally false.

The SAC fails to adequately plead falsity because (1) the facilities at issue are doctor's offices; and (2) Stebbins's falsity theory relies on an overbroad reading of "general, non-specific compliance requirements under federal law" *United States ex rel. Stebbins v. Vascular Access Ctrs., LLC*, No. 19-cv-1524, 2024 WL 3069902, at *6 (W.D. Pa. June 20, 2024).

13

"Pennsylvania law explicitly excludes physicians' offices, like Defendant . . . , from Pennsylvania DOH's licensing jurisdiction to be subject to the ASF rules[.]" *Maraposa Surgical*, 2024 WL 1299705, at *3 (citing 35 Pa. Cons. Stat. § 448.802a). That statutory provision provides, in relevant part, that the term "[a]mbulatory surgical facility does not include individual or group practice offices of private physicians or dentists, unless such offices have a distinct part used solely for outpatient surgical treatment on a regular and organized basis." 35 Pa. Cons. Stat. § 448.802a; *see also* 28 Pa. Code § 551.3(ii) (providing that an ambulatory surgical facility does not include individual or group practice offices or private physicians or dentists, unless the offices have a distinct part used solely for outpatient surgical treatment on a regular and organized basis).

Here, Stebbins says that the facilities at issue are doctor's offices, (ECF No. 57 ¶ 81 ("During the period of time that Relator worked for JCA, he was involved in various conversations and emails that reflected Defendants' knowledge that they were not properly licensed to perform arteriograms in a physicians' office.")); (ECF No. 54 at 12), so for his allegations to sustain the FCA's falsity prong, he must plead that the offices at issue "have a distinct part used solely for outpatient surgical treatment on a regular and organized basis." 35 Pa. Cons. Stat. § 448.802(a). Stebbins has not sufficiently pled that the physician's offices at issue met that exception. By extension, Stebbins has not pled that Pennsylvania's ambulatory surgical facility licensing requirements applied to Defendants. Because Pennsylvania law does not necessarily mandate Defendants to comply with the facility licensing requirements that Stebbins says were violated, Defendants did not submit legally false claims under Medicare.[4]

---

[4] As to Stebbins's Medicaid-based informed consent theory, such fails to support the FCA's falsity element. *See Vascular Access Ctrs.*, 2024 WL 3069902, at *7 ("The 'adequacy of the informed consent' obtained by Defendants and their doctors, 'are claims more akin to a medical malpractice action and not an FCA action.'") (quoting *United States ex rel. Lord v. NAPA Mgmt. Servs. Corp.*, No. 13-cv-2940, 2017 WL 5450757, at *10 (M.D. Pa. Nov. 14, 2017)).

14

Even if Stebbins had pled that the facilities at issue met the "solely used for outpatient surgical treatment" exception under Pennsylvania law, the FCA is not so broad as to mandate compliance with all state law facility licensing requirements. *Escobar*, 579 U.S. at 196 ("[I]f the Government required contractors to aver their compliance with the entire U.S. Code and Code of Federal Regulations, then under this view, failing to mention noncompliance with any of those requirements would always be material. The False Claims Act does not adopt such an extraordinarily expansive view of liability."); *Vascular Access Ctrs.*, 2024 WL 3069902, at *6 (applying that portion of *Escobar's* analysis to the FCA's falsity prong); *Maraposa Surgical*, 2024 WL 1299705, at *3 ("Here, Relator conflates facility licensure with individual provider licensure and regulations dealing with hospitals versus physician offices. . . . Thus, the Court finds Relator cannot establish falsity."). Stebbins's theories of falsity are overinclusive and do not sufficiently allege violations of federal conditions of payment. Therefore, even if Pennsylvania facility licensing requirements applied to Defendants, the submission of claims to Medicare and Medicaid despite compliance with such requirements does not amount to the submission of false claims in violation of the FCA.

In summary, Pennsylvania law exempts doctor's offices—like the facilities at issue—from ambulatory surgery licensing requirements, and by extension, Defendants did not falsely certify that they were in compliance with such requirements. Absent that exemption, Medicare (and Medicaid's) conditions of payment requirements are not so broad as to incorporate all alleged violations of state licensing requirements and strained arguments regarding alleged failures to obtain informed consent. Therefore, the SAC fails to plead falsity.

## IV. LEAVE TO AMEND

Third Circuit law generally favors curative amendment unless such would be inequitable or futile. *Phillips v. Cnty. of Allegheny,* 515 F.3d 224, 236 (3d Cir. 2008). When providing leave to amend after the dismissal of the First Amended Complaint, the Court remarked that "the parties should not expect" that leave to amend would be granted another time, and such is consistent with Supreme Court precedent regarding amendment. *Foman v. Davis*, 371 U.S. 178, 181–82 (1962) (per curiam) (holding that repeated failure to cure deficiencies is a proper basis for denying leave to amend); *see also Mullin v. Balicki*, 875 F.3d 140, 149 (3d Cir. 2017) (same).

Here, further amendment would be both futile and in violation of *Foman's* "repeated failure to cure" factor. Medicare explicitly allows for reimbursement where arteriograms and related procedures are performed in a physician's office and pays out millions of dollars for such claims each year. Consequently, there is no set of facts that Stebbins could plead to state plausible FCA violations.

In addition, the SAC was Plaintiff-Relator's third bite at the apple. Given that this Circuit disfavors "wait and see pleading," the Court will not provide him with a fourth go-around. *See Rice v. Nathan*, 2023 WL 4549979, at *4–*5 (W.D. Pa. July 14, 2023) (first citing *Jang v. Bos. Sci. Scimed, Inc.*, 729 F.3d 357, 368 (3d Cir. 2013) and then citing *CMR D.N. Corp. v. City of Phila.*, 703 F.3d 612, 629 (3d Cir. 2013)).

Accordingly, Plaintiff-Relator's claims are dismissed with prejudice.

## V.  CONCLUSION

For the reasons set forth above, Stebbins's claims are dismissed with prejudice. The Clerk shall close the case on the docket.

s/ Mark R. Hornak<br>
Mark R. Hornak<br>
Chief United States District Judge

Dated:  August 29, 2024